FILED
at ___ O'clock & ___ min. ___ M

JUL 1 6 2008

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF SOUTH CAROLINA

United States Bankruptcy Court
Columbia, South Carolina (26)

| | |
|---|---|
| In re,<br><br>Worldwide Wholesale Lumber, Inc.,<br><br>Debtor(s). | C/A No. 06-01499-JW<br><br>Adv. Pro. No. 07-80008-JW<br><br>Chapter 7 |
| Michelle L. Vieira,<br><br>Plaintiff(s),<br><br>v.<br><br>AGM II, LLC, Lancelot Investor Fund, L.P. d/b/a Surge Capital,<br><br>Defendant(s). | ORDER |

ENTERED

JUL 1 6 2008

L. G. R.

This matter comes before the Court upon the Motion for Summary Judgment ("Motion"), filed by Defendants, AGM II, LLC and Lancelot Investors Fund, L.P. Michelle L. Vieira, as Trustee for the Estate of Worldwide Wholesale Lumber, Inc. (d/b/a Veracor Wood Products International) ("Trustee") filed an objection to the Motion. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334(a) and (b). The Court makes the following Findings of Fact and Conclusions of Law pursuant to Fed. R. Civ. P. 52, which is made applicable to this proceeding by Fed. R. Bank. P. 7052:

**FINDINGS OF FACT**

1.  On April 12, 2006 (the "Petition Date"), Tianjin Jinnan Dist. Tongmei Timber Co. Ltd., Wenan Xinda Wood Industry Co. Ltd., Jack B. Hoy, Inc. and Nelson Sales & Marketing Co., Inc. (collectively, the "Petitioning Creditors") filed an involuntary petition for relief against Worldwide Wholesale Lumber, Inc. d/b/a Veracor Wood Products International ("Debtor") under chapter 7 of the Bankruptcy Code.

2. On April 13, 2006, Debtor consented to an entry of an order for relief under chapter 7 of the Bankruptcy Code.

3. On April 18, 2006, the Court entered an order for relief under chapter 7 of the Bankruptcy Code.

4. The Trustee was appointed as the trustee of Debtor's estate on April 18, 2006.

5. Prior to the commencement of this case, Debtor operated under the name of Veracor Wood Products International and was headquartered in Mt. Pleasant, South Carolina. Debtor's business consisted of purchasing and importing plywood from foreign countries and reselling such plywood in the domestic market.

6. In the operation of its business, Debtor purchased goods from certain vendors in China (the "Chinese Mills"), who would ship their goods to the United States under bills of lading. Certain of the shipments from the Chinese Mills were upon terms by which the Debtor was to pay the purchase price for the goods as a condition to receive the bill of lading for the goods, which bill of lading would provide ownership rights in the goods to Debtor (referred to as "Document Against Payment System").

7. On June 22, 2005, Debtor and AGM II, LLC and Lancelot Investors Fund, LP (collectively "AGM") entered into a Master Financing Agreement, whereby AGM provided pre-petition financing to Debtor pursuant to an asset-based credit facility, which included two credit line components, one based upon eligible accounts receivable of Debtor and the other based upon inventory acquired and owned by Debtor. AGM's credit facility was secured by a blanket lien on all pre-petition assets of the Debtor.

8. During the 90-day period preceding the Petition Date (the "90-day Period"), Debtor obtained bills of lading covering certain goods and materials (the "Goods") pursuant to the Document Against Payment System from the Chinese Mills without making payment to the Chinese Mills for the Goods. The Goods were subsequently sold and the proceeds were deposited into a bank account from which only AGM could withdraw funds (the "Lock Box Account").

9. Prior to the Petition Date and during the 90-day Period, AGM required that all payments of proceeds of Debtor's assets be deposited into the Lock Box Account. AGM withdrew funds from the Lock Box Account on a regular basis and applied the funds towards payment of the indebtedness owed to AGM by Debtor.

10. In January of 2006, Mark Kaplan ("Kaplan") was hired as a consultant by AGM and was placed on-site at Debtor's office, where he remained through April of 2006. Kaplan analyzed funding requests from Debtor to AGM and assisted AGM in determining whether Debtor's funding requests should be granted in light of AGM's anticipated losses. At some point after his arrival at Debtor's office, Kaplan suggested to Russell Stadelman, Debtor's president ("Stadelman"), that he convince the Chinese Mills to sell inventory on open account so Debtor's inventory levels would increase.

11. In January of 2006, AGM became aware that Debtor had been taking delivery of bills of lading from some of its suppliers before paying for the goods covered by those bills of lading. The proceeds of the wrongfully procured bills of lading were never segregated from the proceeds of properly procured bills of lading.

12. In exchange for its forbearance from foreclosing on its collateral during early 2006, AGM insisted on Debtor's compliance with obligations under its loan agreement,

including the appointment of an independent director and the pledging of Stadelman's shares of Debtor's stock.

13. On January 23, 2006, AGM wrote to certain warehouses with which AGM and Debtor had entered into Warehousing Agreements and directed each warehouse to release and ship inventory only upon the written approval by AGM.

14. In February of 2006, Debtor hired David Peterson, a turnaround consultant working with Morris Anderson. Mr. Peterson was present at Debtor's office every business day from February 6, 2006 through March 22, 2006.

15. On April 24, 2006, AGM sought relief from the automatic stay on an expedited basis so that it could foreclose on its security interest in its collateral held by Debtor.

16. A hearing on AGM's Motion for Relief from the Automatic Stay was held on April 28, 2006. The parties agreed to consent to the order granting AGM relief from the automatic stay under specified conditions and the Court entered an oral ruling granting AGM relief from the automatic stay under the terms specified by the parties.

17. On April 28, 2006, AGM conducted a public auction of Debtor's remaining inventory pursuant to Article 9-610 of the Uniform Commercial Code ("UCC Sale"). AGM was the successful bidder at the sale with its credit bid of $1 million.

18. On July 19, 2006, Wells Fargo Bank ("Wells Fargo") filed a proof of claim, asserting an unsecured claim in the amount of $2,482.577.76 for payments it made "on certain drafts which funds were used to pay for goods purchased by the Debtor [from the Chinese Mills]." Wells Fargo made the payments to certain Chinese banks between May 8, 2006 and June 21, 2006.

## **CONCLUSIONS OF LAW**

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, made applicable to this adversary proceeding by Rule 7056 of the Federal Rules of Bankruptcy Procedure, summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. When a motion for summary judgment is filed, the Court does not weigh the evidence, but determines if there is a genuine issue for trial. T 2 Green, LLC v. Abercrombie (In re T 2 Green, LLC), 363 B.R. 753, 763 (Bankr. D.S.C. 2006); Listak v. Centennial Life Ins. Co., 977 F.Supp. 739, 743 (D.S.C. 1997)(citing Anderson v. Liberty Lobby, 477 U.S. 242, 249, 106 S.Ct. 2505 (1986)). "If no material factual disputes remain, then summary judgment should be granted against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which the party bears the burden of proof at trial." Listak, 977 F.Supp. at 742 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552 (1986)). "The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact." Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 522 (4th Cir. 2003), cert. denied, 541 U.S. 1042, 124 S.Ct. 2171, 158 L.Ed.2d 732 (2004). Once the moving party has met this burden, the burden shifts to the non-moving party to come forward with specific facts demonstrating that a genuine issue exists for trial. Fed. R. Civ. P. 56(e); T 2 Green, 363 B.R. at 763.

**I.      Equitable Subordination**

A creditor's claim can be subordinated under 11 U.S.C. § 510(c) if the party seeking equitable subordination can demonstrate that: (1) the claimant engaged in inequitable conduct; (2) that conduct injured other creditors; and (3) subordination is consistent with

5

other bankruptcy law. EEE Commercial Corp. v. Holmes (In re ASI Reactivation, Inc.), 934 F.2d 1315, 1321 (4th Cir. 1991); Anderson & Associates, PA v. Southern Textile Knitters De Honduras Sewing Inc. (In re Southern Textile Knitters), 65 Fed. Appx. 426, 439 (4th Cir. Jan. 16, 2008). AGM asserts that it is entitled to summary judgment on this cause of action because there is no evidence indicating that it engaged in any type of inequitable conduct. Inequitable conduct generally involves conduct such as fraud, breach of fiduciary duty, illegality, undercapitalization, or use of the debtor as an alter ego. In re Hoffman Assoc., Inc., 194 B.R. 943, 965 (Bankr. D.S.C. 1995). The Trustee asserts that the following actions of AGM constitute inequitable conduct: (1) AGM knowingly kept the proceeds of wrongfully obtained bills of lading; (2) AGM had control over the daily operations at the Debtor's business; and (3) AGM controlled Debtor's funding requests and at times refused to provide the amount of funding requested by Debtor.

AGM admits that it discovered Debtor was receiving original bills of lading improperly, but presented evidence indicating that Kaplan, its agent, advised Debtor to cease accepting such bills of lading in the future and to return them to Wells Fargo. However, the Trustee presented the testimony of Stadelman, who stated that Kaplan advised against returning the bills of lading to Wells Fargo and that AGM refused to allow him to return the inventory to the respective vendors. The Trustee also presented evidence indicating that the goods covered by the wrongfully procured bills of lading were sold and AGM ultimately took possession of the proceeds. Based on the evidence presented, the Court finds that a genuine issue of material fact remains as to whether AGM engaged in inequitable conduct.[1]

---

[1] Having determined that there is a genuine issue of material fact as to whether AGM engaged in inequitable conduct by means of knowingly retaining the proceeds of wrongfully obtained goods, the Court finds it unnecessary to determine at this time whether the remaining alleged actions of AGM constitute inequitable conduct.

AGM further asserts that there is no evidence indicating that this alleged misconduct caused injury to any other creditors or conferred an unfair advantage to AGM. It appears from the evidence presented by the Trustee, however, that certain creditors were injured when they did not receive payment for their goods and they lost their security interest in the goods by losing possession of the bills of lading covering those goods. The creditors initially injured by this alleged misconduct were the Chinese Mills, but they were ultimately compensated by Wells Fargo, which received nothing in exchange for this payment and now asserts an unsecured, non-priority claim against the bankruptcy estate. Based on this evidence, it appears that there is a genuine issue of fact as to whether creditors were injured by AGM's alleged misconduct. If AGM's conduct is determined to be inequitable and injurious to creditors, it further appears that subordination of AGM's claim would be consistent with the Bankruptcy Code because it would restore the fair distribution of assets to creditors. See Hoffman, 194 B.R. at 966 (Bankr. D.S.C. 1995)("Equitable subordination is consistent with other provisions of the Bankruptcy Code if it is consistent with the basic goal of equality of distribution in bankruptcy.")

As the Court finds that there is a genuine issue of material fact as to whether AGM knowingly kept the proceeds of the wrongfully obtained bills of lading and whether AGM's conduct injured other creditors, AGM's motion for summary judgment as to the Trustee's equitable subordination cause of action is denied.

### II.    Reclassification

Since the reclassification cause of action was withdrawn by the Trustee in her objection to the Motion, the Court finds that the Motion as it relates to this cause of action is moot.

### III. Avoidance & Recovery of Preferential Transfers

AGM asserts that the Trustee has failed to demonstrate that there was a transfer of an interest of Debtor in property and thus fails to meet the requirements of 11 U.S.C. § 547(b). 11 U.S.C. § 547(b) provides that the Trustee may avoid any transfer of *an interest of the debtor in property* that is made:

> (1) to or for the benefit of a creditor;
> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
> (3) made while the debtor was insolvent;
> (4) made—
>  (a) on or within 90 days before the date of the filing of the petition; or
>  (b) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider and;
> (5) that enables such creditor to receive more than such creditor would receive if—
>  (a) the case were a case under chapter 7 of this title;
>  (b) the transfer had not been made; and
>  (c) such creditor received payment of such debt to the extent provided by the provisions of this title.

"Interest of debtor in property" has been interpreted by the United States Supreme Court to include "that property that would have been part of the estate had it not been transferred before the commencement of the bankruptcy proceedings." Begier v. IRS, 496 U.S. 53, 58, 110 S.Ct. 2258, 2263, 110 L.Ed.2d 46, 56 (1990). "The primary consideration in determining if funds are property of the debtor's estate is whether payment of those funds diminished the resources from which the debtor's creditors could have sought payment." In re Southmark, 49 F.3d 1111, 1117 (5th Cir. 1995).

Property of the estate is defined broadly by the Bankruptcy Code as including "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541. This Court has previously stated that "the scope of §541 is so broad that, to be

8

included within the term 'property of the estate,' the item does not necessarily have to be in the debtor's possession.... It therefore follows that there is an abundance of case law which holds that a possessory interest in property, without more, is sufficient as a property interest to be part of the estate." McGuffin v. Barman (In re BHB, LLC), C/A No. 97-10975, Adv. No. 97-80201, slip op. at 7-8 (Bankr. D.S.C. Aug. 27, 1997) (internal citations omitted).

The Trustee has presented evidence that the proceeds from the wrongfully obtained goods were removed from Debtor's bank account by AGM. The Trustee asserts that if the proceeds had not been swept from the account by AGM, the account and its contents would have been property of the estate. AGM argues that Debtor had no interest in the proceeds because the bills of lading were stolen. However, the Trustee argues that the bills of lading were not stolen, they were wrongfully obtained in the sense that Debtor failed to comply with the terms of its agreement with the vendors of the goods by paying for the goods prior to receiving the bills of lading covering those goods. The evidence indicates that some of the same vendors sold goods to Debtor on open account and permitted Debtor to receive the bills of lading for those goods prior to making payment for the goods. The Trustee also presented evidence that Debtor paid demurrage charges, freight charges and other costs associated with acquiring the inventory covered by the wrongfully procured bills of lading. Evidence was further presented that the vendors of the wrongfully obtained goods were paid in full by Wells Fargo, who filed a claim against the estate for the amount it paid to these vendors. Given the broad scope of property of the estate, the evidence presented by the Trustee appears to create a genuine issue of material fact regarding whether Debtor had an interest in the proceeds of the wrongfully obtained goods. Therefore, the Court denies AGM's motion for summary judgment as to this cause of action.

IV.     **Breach of Fiduciary Duty**

AGM asserts that it is entitled to summary judgment on the Trustee's breach of fiduciary duty cause of action because the Trustee has failed to demonstrate a basis upon which to impose a fiduciary duty owed by AGM to Debtor under South Carolina law.[2] As parties to a financing agreement, AGM and Debtor would not typically be each other's fiduciaries. See Burwell v. South Carolina Nat'l Bank, 288 S.C. 34, 340 S.E.2d 786 (1986) ("The normal bank-depositor arrangement creates a creditor-debtor relationship rather than a fiduciary one."). There is a presumption that the contractual relationship between a lender and a borrower is conducted at arms-length and each party is acting in their own interest. See Regions Bank v. Schmauch, 354 S.C. 648, 582 S.E.2d 432, 444 (Ct. App. 2003) ("One who signs a written instrument has the duty to exercise reasonable care to protect himself."); Temp-Way Corp v. Continental Bank, 139 B.R. 299 (E.D. Pa. 1992). Nevertheless, under certain circumstances, AGM, as the lender, could create a fiduciary relationship by exercising improper control over Debtor, the borrower. See NCNB Nat'l Bank of N.C. v. Tiller, 814 F.2d 931, 936 (4th Cir. 1987)(applying South Carolina law), *overruled on other grounds*, Busby v. Crown Supply, Inc., 896 F.2d 833 (4th Cir. 1990); see also K Town, Inc. v. Metropolitan Bank & Trust Co. (In re K Town), 171 B.R. 313 (Bankr. N.D. Ill. 1994). "Where a creditor has taken control of the debtor, he assumes the fiduciary duties of management and a duty to deal fairly with other creditors.... The creditor's duty of fair dealing is increased in the precise degree that the creditor has power and control over the debtor's affairs." In re AtlanticRancher, Inc., 279 B.R. 411, 439 n.16 (Bankr. D. Mass.

---

[2] Since the Trustee's breach of fiduciary duty cause of action is a state law claim, South Carolina law would apply. Hunt v. Robinson, 852 F.2d 786, 787 (4th Cir. 1988)(applying South Carolina law). Likewise, South Carolina law also applies to the Trustee's state law claims for constructive trust and accounting. See Johnson v. Collins Entertainment Co., Inc., 199 F.3d 710 (4th Cir. 1999) (applying South Carolina law); Elmore v. Cone Mills Corp., 23 F.3d 855 (4th Cir. 1994)(applying South Carolina law).

2002)(quoting In re Beverages Int'l Ltd., 50 B.R. 273, 281 (Bankr. D. Mass. 1985)). Control may be demonstrated by a showing that the lender was involved in the actual day-to-day management and operations of the borrower or that the lender had the ability to compel the borrower to engage in unusual transactions. Tiller, 814 F.2d at 936; see also Temp-Way Corp v. Continental Bank, 139 B.R. at 318.

AGM presented the testimony of Peterson, who testified that that he was given control over all of Debtor's operational decisions. Peterson also testified that Kaplan did not have control of Debtor. Based on this testimony, AGM asserts that it was not involved in the day-to-day management of Debtor. However, the Trustee presented evidence that Kaplan was placed at Debtor's place of business by AGM in January of 2006 and exercised control over Debtor's inventory and receivables on behalf of AGM. In addition, the Trustee presented the affidavit of Raymond Kelley, an employee of Rogers & Brown Customs Broker, Inc. ("Rogers & Brown"), who stated that AGM advised Rogers & Brown in January of 2006 that it would provide instructions regarding Debtor's business with Rogers & Brown from that point and that Rogers & Brown could no longer accept instructions from Debtor. He further stated that AGM imposed new procedures upon Rogers & Brown and that it was his understanding that Kaplan was the "new Sheriff in town." Kelley also stated that he communicated regularly with Kaplan regarding clearing goods through customs between March of 2006 and May of 2006. The Trustee also presented evidence that Kaplan encouraged Stadelman to convince the Chinese Mills to sell further inventory to Debtor on open account, which was not their normal course of business and increased Debtor's unsecured trade debt, thus deepening its insolvency. AGM presented the testimony of

Peterson, who stated that the transactions suggested by Kaplan were a good idea for all concerned.

The Court finds that there is conflicting evidence regarding the extent of AGM's involvement in the day-to-day management and operations of Debtor and whether AGM compelled Debtor to engage in unusual transactions. The conflicting evidence in the record must be weighed by the finder of fact to determine whether AGM's involvement is sufficient to impose fiduciary obligations upon AGM. Accordingly, the Court finds that AGM's motion for summary judgment as to the Trustee's breach of fiduciary duty cause of action should be denied.

### V.     Constructive Trust & Accounting

Under South Carolina law, a constructive trust arises by operation of law whenever a party has obtained money or property which does not equitably belong to him and which he cannot in good conscience retain or withhold from another who is beneficially entitled to it. SSI Medical Services, Inc. v. Cox, 301 S.C. 493, 392 S.E.2d 789, 793-94 (S.C. 1990). An accounting may be appropriate where there is a long, complicated account or need for discovery or to prevent unjust enrichment and require relinquishment of property when there is a breach of fiduciary duty. See Rogers v. Salisbury Brick Corp., 299 S.C. 141, 382 S.E.2d 915. 197 (1989). AGM asserts that it is entitled to summary judgment on the Trustee's constructive trust cause of action because the facts gathered in discovery conclusively establish that AGM engaged in no inequitable conduct with respect to Debtor and owed no fiduciary duty to Debtor, which would serve as a basis for imposing a constructive trust or an accounting. AGM further asserts that there is no evidence indicating that AGM received money or property which it improperly retained. The Court has previously found that a

genuine issue of material fact remains as to whether AGM engaged in inequitable conduct by retaining the proceeds of the wrongfully obtained goods and whether AGM owed a fiduciary duty to Debtor. Accordingly, AGM's motion for summary judgment as to the constructive trust cause of action must also be denied.

Based on the foregoing, it is hereby

ORDERED that AGM's Motion is denied.

**AND IT IS SO ORDERED.**

_____
UNITED STATES BANKRUPTCY JUDGE

Columbia, South Carolina
July 16, 2008